**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

GRODNER & ASSOCIATES, APLLC                                    CIVIL ACTION

                                                                                            17-44-SDD-RLB

VERSUS

REGIONS BANKS

<u>RULING</u>

This matter is before the Court on the *Motion for Summary Judgment,*[1] filed by

Defendant Regions Bank ("the Bank").   Plaintiff, Grodner & Associates, APLLC

("Plaintiff"), has filed an *Opposition*[2] to this motion, to which the Bank filed a *Reply.*[3]  For

the reasons which follow, the Bank's motion shall be GRANTED.

**I.      BACKGROUND**

Plaintiff is a Baton Rouge law firm that utilized the Bank for its day-to-day banking.[4]

Plaintiff hired Anna Alford ("Alford") as its bookkeeper in February 2015.[5]  A mere month

after Alford began working for Plaintiff, she began forging checks that she would

sometimes present to the Bank's College Drive branch, and the Bank would cash the

checks.[6]  Alford also received funds from fraudulent Automated Clearing House ("ACH")

transactions.  Plaintiff claims that the Bank had previously placed Alford on "a list" based

---

[1] Rec. Doc. No. 15.
[2] Rec. Doc. No. 21.
[3] Rec. Doc. No. 25.
[4] Rec. Doc. No. 1-2, ¶¶ 1, 6.
[5] *Id.* at ¶ 6.
[6] *Id.* at ¶ 13.

on her alleged past fraudulent banking conduct.[7]   Plaintiff contends the Bank never notified Plaintiff about Alford's history,[8] and the Bank failed to follow its policy of calling Plaintiff to gain telephone approval to disburse funds any time a non-account holder attempted to cash a check drawn on the Bank.[9]

Plaintiff also claims Alford would intercept the bank statements sent by the Bank and would photo shop the bank statements to conceal her fraudulent activity.[10]   Only when Plaintiff's manager and member, Donna Grodner ("Grodner"), bounced a personal check in June 2016, was Alford's fraud finally detected.[11]   Plaintiff claims that, in June 2016, Grodner "could not figure out why the books did not seem consistent with reality."[12]

Plaintiff also contends the Bank was either in bad faith or grossly negligent in failing to check the signature on Alford's checks against Plaintiff's signature card or contemporaneous checks.[13]   Plaintiff maintains it is not liable on these instruments because the checks were not signed by Grodner, the only authorized signer.[14]   Further, Plaintiff alleges that, if the Bank had checked Plaintiff's bank statements prior to cashing Alford's checks, it would have discovered that Alford was paid by ACH and never by check like all of Plaintiff's employees.[15]

Plaintiff contends Grodner exercised reasonable care in checking the firm's bank statements, but Alford's photo shopped statements prevented her from ascertaining the

---

[7] *Id.* at ¶ 7.
[8] *Id.* at ¶ 8.
[9] *Id.* at ¶ 9.
[10] *Id.* at ¶ 15.
[11] *Id.* at ¶ 16.
[12] *Id.*
[13] *Id.* at ¶ 20.
[14] *Id.* at ¶ 21.
[15] *Id.* at ¶ 22.
Document Number: 47540

fraud.[16]  Due to the alleged bad faith or gross negligence on the part of the Bank, Plaintiff contends Alford was paid more than $150,000.00 over the course of a little over a year, which constitutes conversion under Louisiana law.[17]

The Bank maintains that it is not responsible for Plaintiff's losses because Plaintiff's own conduct substantially contributed to the alleged forgeries.[18]  The Bank notes that Grodner admitted in her deposition that her previous bookkeeper had defrauded Plaintiff in the same or similar manner as Alford.[19]  Further, Plaintiff's losses resulted from Plaintiff's failure to exercise ordinary care in supervising its employee and timely examining its bank statements.[20]  Additionally, the Bank claims it owed no duties to Plaintiff beyond those set forth in the Deposit Agreements governing Plaintiff's operating (account ending in 1715) and trust (account ending in 1634) accounts and applicable law.[21]

Grodner met with the Bank's College Drive branch employee Jorge Canedo-Martinez ("Martinez") in June 2016, and together they identified a number of unauthorized items made payable to Alford that had cleared Plaintiff's bank accounts, dating back to January 2016 on one account and April 2016 on the other.  Subsequent to this meeting, Martinez prepared two Affidavits of Claimant Negotiable Instruments, one identifying unauthorized items paid to Alford from the firm's operating account, and a second that identified the unauthorized items paid to Alford from the firm's trust account.[22]  One week

---

[16] *Id.* at ¶ 26.
[17] *Id.* at ¶ 28.
[18] Rec. Doc. No. 5 at 4.
[19] Rec. Doc. No. 15-3 at 15 (Deposition of Donna Grodner, p. 14).
[20] *Id.* at 4-5.
[21] *Id.* at 5.
[22] Rec. Doc. Nos. 15-16 & 15-17.
Document Number: 47540

after receiving these Affidavits, Grodner reviewed and executed the documents. However, Plaintiff's claims for reimbursement were ultimately denied by the Bank as untimely under both the Deposit Agreement and Louisiana law.[23] This letter prompted Plaintiff to file this lawsuit.

The record reflects that Grodner identified as forgeries 44 checks drawn on the operating account.[24] Grodner testified that the oldest of these forgeries was check number 6760, dated March 20, 2015.[25] The Bank claims Grodner admitted that this check was listed and reproduced in full on the account statement for the period of February 28, 2015 through March 31, 2015, which was mailed by the Bank to Plaintiff; however, the Bank cites to an admission not included in the cited exhibit.[26]

Grodner acknowledged that there were 25 checks identified as forgeries drawn on the trust account, and the earliest item was check number 3113, dated March 26, 2015.[27] Again, the Bank claims Grodner admitted that this check was listed and reproduced in full on the account statement for the period of February 28, 2015 through March 31, 2015 which was mailed by the Bank to Plaintiff; however, the Bank cites to an admission not included in the cited exhibit.[28]

Further, the Bank claims that, of the 69 checks at issue, only 15 of the forged checks were cashed by Alford at one of the Bank's branches, and only 3 were cashed by

---

[23] Rec. Doc. No. 15-18.
[24] Rec. Doc. No. 15-19.
[25] Rec. Doc. No. 15-3 at 60-61 (Deposition of Donna Grodner, pp. 59-60).
[26] Defendant cites to Rec. Doc. No. 15-15, Response to Request for Admission No. 13, but this document ends at Request for Admission No. 11.
[27] Rec. Doc. No. 15-3 at 59-60 (Deposition of Donna Grodner, pp. 58-59).
[28] Defendant cites to Rec. Doc. No. 15-15, Response to Request for Admission No. 14, but this document ends at Request for Admission No. 11.

Alford at the Bank's College Drive branch.[29]  Indeed, the record reflects that the majority of checks were cashed by Alford at Wal-Mart stores.[30]

Plaintiff also contends Alford made 34 unauthorized ACH transactions from the operating account over the course of fifteen months.[31]  Grodner testified that the oldest of these ACH transactions was made on April 15, 2015.[32]  The Bank contends this transaction appeared on the account statement for the period of April 1, 2015 through April 30, 2015 that was mailed by the Bank to Plaintiff.[33]

The Bank now moves for summary judgment on the basis that (1) Plaintiff failed to report Alford's fraud within the time period set forth by the Deposit Agreement or within the deadline set forth by Louisiana law; (2) the Bank exercised ordinary care and was not required by the Deposit Agreement or by law to check the signatures on Plaintiff's checks; (3) the "same wrongdoer" rule precludes Plaintiff's recovery against the Bank; and (4) the Bank was not a fiduciary.

## II.     LAW AND ANALYSIS

### A.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[34]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing

---

[29] Rec. Doc. No. 15-14.
[30] *Id.*
[31] Rec. Doc. No. 15-19 at 5.
[32] Rec. Doc. No. 15-3 at 61 (Deposition of Donna Grodner, pp. 60).
[33] Rec. Doc. No. 15-4 (Affidavit of Jorge M. Canedo-Martinez).
[34] Fed. R. Civ. P. 56(a).
Document Number: 47540

the evidence."[35]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[36]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[37]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[38]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[39]  All reasonable factual inferences are drawn in favor of the nonmoving party.[40]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[41]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[42]

---

[35] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[36] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[37] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[38] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[39] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[40] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[41] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[42] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir.

Document Number: 47540

**B.** **Timely Reporting of the Fraud under the Deposit Agreement and Louisiana Law**

1. Plaintiff is Bound by the 2015 Deposit Agreement

The Bank contends that the 2007 Deposit Agreement,[43] which was in place when Plaintiff opened the accounts at issue, and the 2015 Deposit Agreement,[44] which superceded the 2007 Deposit Agreement, govern the relationship between the Parties. Plaintiff claims that it never received notice nor did it agree to any modifications to the 2007 Deposit Agreement; thus, the 2015 Deposit Agreement is irrelevant to this case. Plaintiff also argues that the Signature Card is the only contract between the Parties in this case, and, but for the Bank's breach of its duty to inspect and compare signatures pursuant to the Signature Card, Plaintiff would not have been defrauded.

Despite arguing that Plaintiff is not subject to the terms of the Deposit Agreement, Plaintiff cites the language of the Signature Card which expressly provides that "the person(s) signing below … (b) **agrees to be bound by the terms of the Bank's Deposit Agreement and pricing schedule as now in force and as may be amended thereafter** … ."[45] Grodner admitted in her deposition that she signed these documents;[46] therefore, any argument that the 2015 Deposit Agreement does not constitute the contract between the Parties is without merit and belied by Grodner's own admission. Nevertheless, the Bank submits both the 2007 and 2015 Deposit Agreements and contends that the sections at issue in this litigation are unchanged from the 2007 to the 2015 agreement.

---

1994)(quoting *Anderson*, 477 U.S. at 249).
[43] Rec. Doc. No. 15-8.
[44] Rec. Doc. No. 15-9.
[45] Rec. Doc. No. 21 at 1, quoting Rec. Doc. No. 15-5 at 2 (emphasis added).
[46] Plaintiff's argument is undermined by Rec. Doc. Nos. 15-5 & 15-6 which Grodner admitted she signed upon opening these accounts. Rec. Doc. No. 15-3 at 23 (Deposition of Donna Grodner, p. 22).
Document Number: 47540

Plaintiff does not dispute this fact.

2. <u>Legal and Contractual Deadlines to Report Fraud</u>

Section 10 of the 2015 Deposit Agreement states as follows:

**Review of Statements**. You are responsible for exercising reasonable promptness in examining your account statement each statement period, or if provided, originals or imaged copies of cancelled checks, or your account activity through the internet if we provide such access, to determine whether any payment or debit was not authorized because of an alteration of an item or because a signature or endorsement on the item was unauthorized, or for any other discrepancy or reason for which you believe that the debit is not correct. If you discover an unauthorized payment or other discrepancy, you must promptly notify us in writing of the relevant facts. Your report must identify the specific items or debits that you are challenging.

If you fail to comply with your duty to examine your statements and account activity and report errors, discrepancies, and unauthorized transactions, in addition to any and all other rights available to us, we shall have the defenses contained in §4-406 of the Uniform Commercial Code (UCC), as amended, as adopted in the state in which your account was established. In addition, **if your claim involves a series of items containing unauthorized signatures or alterations by the same wrongdoer, you shall be precluded from asserting against us any unauthorized signature or alteration by the same wrongdoer on any item paid in good faith on or after 10 calendar days after the first statement describing the first altered or unauthorized items was sent or made available to you.** By this provision, you and we intend to define a reasonable time period for the examination of bank statement for the purposes of the "Repeater Rule," or the "Same Wrongdoer" rule as provided in § 4-406(d) of the UCC.[47]

It is undisputed that both the law[48] and the Deposit Agreement impose on the

---

[47] Rec. Doc. No. 15-5 at 10 (emphasis added).
[48] La. R.S. § 10:4-406(c) provides: "If a bank sends or makes available a statement of account or items pursuant to Subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts."

Document Number: 47540

customer the obligation to review bank statements promptly to determine any fraudulent activity. The Bank argues that Plaintiff's claims are barred by both the Deposit Agreement and La. R.S. § 10:4-406 because Plaintiff failed to properly inspect its bank statements and did not report the fraud for well over a year after receiving the bank statements that indicated fraud.

Plaintiff claims it complied with its obligation to review the bank statements but was unable to detect the fraud because Alford photo-shopped the bank statements. Further, Plaintiff claims that the bank statements "do not provide sufficient information as to who the payees are and for whom."[49] For example, Grodner claims that, because Plaintiff has two Entergy accounts, the fact that two Entergy payments appeared on the bank statements did not alert Grodner to fraudulent activity although it was later discovered that one of the Entergy payments was made on Alford's personal Entergy account.

Plaintiff's argument demonstrates a misunderstanding of what is required of the Bank. The law does not require that Plaintiff actually received the statements; it requires only that the Bank sent or made the statements available to its customers.[50] There is no evidence that the Bank failed to timely send the bank statements to Plaintiff, and Grodner admitted that the Bank properly sent the monthly bank statements to the correct address. The Bank cannot be responsible for what happened to the bank statements once in the hands of Alford, an employee Plaintiff authorized to receive and open the mail.[51]

---

[49] Rec. Doc. No. 21 at 7.

[50] *See Grubaugh v. Central Progressive Bank*, No. 13-3045, 2014 WL 794141 at * 3 (E.D. La. Feb. 27, 2014)(citing *Gulf States Section, PGA, Inc. v. Whitney National Bank of New Orleans*, 96–0844 (La.App. 4 Cir. 2/12/97) 689 So.2d 638, 640–641 (precluding recovery on forged checks despite the court's finding that the plaintiff's employee was intercepting the true statements and replacing them with forged statements)).

[51] Grodner testified that, during the relevant time period, there was no procedure in place that prohibited the firm's bookkeeper from opening the monthly bank statements. Rec. Doc. No. 15-3 at 13 (Deposition of Document Number: 47540

3. "Same Wrongdoer" Defense

The Bank also contends Plaintiff's claims are barred under the "Same Wrongdoer" Rule, which is set forth above in the Deposit Agreement and codified in La. R.S. § 10:4-406(d)(2):

> (d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by Subsection (c), the customer is precluded from asserting against the bank:

> (2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty days, in which to examine the item or statement of account and notify the bank.

Louisiana state courts hold that the "same wrongdoer" rule "imposes on the customer the risk of loss on all subsequent forgeries by the *same wrongdoer* after the customer had a reasonable time to detect an initial forgery if the bank has honored subsequent forgeries prior to notice."[52] In *Marx v. Whitney National Bank*, the Louisiana Supreme Court found that, because the plaintiff did not review and notify the defendant bank of the initial forgeries appearing in a bank statement within thirty days of receipt of that statement, he was "precluded from asserting against the bank *all subsequent forgeries* by the *same* unauthorized signatory."[53]

Here, it is undisputed that Plaintiff did not notify the Bank within 10 days (under the Deposit Agreement), or within 30 days (under La. R.S. § 10:4-406(d)(2)), of the first forged

---

Donna Grodner, p. 12).

[52] *ASP Enterprises, Inc. v. Guillory*, 2008-2235 (La. App. 1 Cir. 9/11/09), 22 So.3d 964, 979 (quoting *Marx v. Whitney Nat. Bank*, 97-3213 (La. 7/8/98), 713 So.2d 1142, 1146))(emphasis original)(internal quotation marks omitted).

[53] *Marx*, 713 So.2d at 1147 (emphasis original).

Document Number: 47540

check appearing on its February through March 2015 bank statement. Further, it is undisputed that all of the forgeries claimed in this case were made by the same wrongdoer, Alford. As the Bank has established these facts, the burden is on Plaintiff to present competent evidence that the Bank failed to exercise ordinary care in honoring the checks. Plaintiff argues that the Bank failed to exercise ordinary care by failing to honor its obligation under the Signature Card to inspect and compare signatures.

4. The Bank's Obligations Pursuant to the Signature Card

Plaintiff maintains that, pursuant to the Signature Card, the Bank may only honor the signature that appears on the Signature Card in making payments of any nature. Further, Plaintiff contends Grodner did not authorize the use of stamp or fax signatures for electronic transactions.

The Bank cites to a portion of Section 5 of the 2015 Deposit Agreement with respect to honoring signatures:

> Authorized Signers; Remotely Created Drafts; Facsimile Signatures. …We may, if we elect to do so, honor items signed in a different form from that set forth on the signature card…***If you use a facsimile signature or other form of signature for signing or authenticating items drown on your account, you assume the entire risk that such facsimile signature or device will be used improperly or by an unauthorized person. We will have no liability to you for paying items signed or authenticated by any person who is not authorized to affix such facsimile signature or use such device or by any person who exceeds his or her authority to do so.***[54]

The Bank also cites the opinion of "leading Uniform Commercial Code commentators" regrading signature verification under modern banking practices:

> In an era of automated check processing, signature verification is a dinosaur. No longer do we find people with green eyeshades comparing

---

[54] Rec. Doc. No. 15-9 at 8 (emphasis added).
Document Number: 47540

checks against signature cards in some musty back room of the bank. Widespread use of facsimile signature machines and rubber stamps would make such a practice reckless, even if it did not cost a penny. Eliminating signature verification saves enormous costs, to the benefit of all depositors. In its wisdom, the Revision recognizes this economic fact of life. If the courts follow the direction of the statute, drawee bank negligence based on faulty signature verification should pay a very limited role in deciding check forgery cases under Revised UCC §§ 3-406 and 4-406. The Revision does not entirely do away with signature verification, but it makes legal rights turn on industry practice, which is rapidly moving in that direction.[55]

The Bank contends its contractual provisions comport with industry standards, and the Bank's practices regarding signature verification comply with the standard of ordinary care as practiced by other commercial banks.

Thus, the Bank claims Plaintiff's negligence/conversion claim fails because (1) the Bank had no duty to compare the signatures of the forged items against the signature card, and Plaintiff agreed to this in the Deposit Agreement; (2) the practice of not checking signatures under modern banking practices falls within the ordinary standard of care; and (3) Grodner admits that Alford was given access to Plaintiff's signature stamp along with an electronic file of Grodner's signature which was used on 64 out of the 69 checks at issue in this case;[56] thus, checking the signatures on these 64 checks would have been futile.

The Court agrees and finds that Plaintiff has failed to carry its burden of demonstrating that the Bank failed to use ordinary care. Plaintiff offers the incongruous arguments that it is not a party to the 2015[57] Deposit Agreement,[58] yet the Bank is bound

---

[55] Rec. Doc. No. 15-1 at 15, quoting Barkley Clark and Barbara Clark, The Law of Bank Deposits, Collections, & Credit Cards, Chapter 10, § 10.06[2] (2015).

[56] Rec. Doc. No. 15-3 at 72-73 (Deposition of Donna Grodner, pp. 71-72); Rec. Doc. No. 15-14.

[57] Plaintiff repeatedly erroneously refers to the 2015 Deposit Agreement as the 2017 Deposit Agreement.

[58] This argument is without merit for the reasons previously discussed herein.

Document Number: 47540

by the terms of the 2015 Deposit Agreement. Plaintiff also argues that the Bank is not relieved of its contractual obligations simply because the contract is "outdated according to market trends."[59] Plaintiff maintains that the Bank was obligated to honor only the signature on the Signature Card; thus, it was required to check and verify the signature before making any payments. Plaintiff argues that the Bank's "excuses" along with evidence that it never intended to compare signatures "smacks in fraud."[60] Nevertheless, Plaintiff fails to cite any jurisprudence to support the claim that a bank is fraudulent in relying on the contract provisions that govern the relationship between the parties.

The Court finds that the Bank exercised ordinary care and complied with its obligations under the governing contracts. Plaintiff claims the Bank had a policy or practice of calling Grodner any time someone other than she presented checks to be cashed. However, Plaintiff failed to present any evidence of such a policy, written or otherwise. Further, "[t]he mere fact that a forgery of a signature on a check is not detected does not prove that a bank's signature verification procedures are not in accordance with reasonable commercial standards of the banking industry."[61] Additionally, "[t]he statutory definition of 'ordinary care' suggests that 'adherence to local business standards and practices can be equated with the exercise of ordinary care, even if those practices are not necessarily in the customer's interest.'"[62]

The Bank relies on the Louisiana First Circuit Court of Appeal's decision in *Groue*

---

[59] Rec. Doc. No. 21 at 3.
[60] *Id.* at 5.
[61] *ASP Enterprises*, 22 So.3d at 977 (citing *Gulf States Section, PGA, Inc. v. Whitney Nat'l Bank of New Orleans*, 96–0844, p. 9 (La.App. 4th Cir.2/12/97), 689 So.2d 638, 643).
[62] *Id.* (quoting A. Brooke Overby, *Check Fraud in the Courts After the Revisions to U.C.C. Articles 3 and 4*, 57 Ala. L.Rev. 351, 379 (2005)).
Document Number: 47540

*v. Capital One.*[63]  In *Groue*, the plaintiff sued the bank after Sherrie L. Simms, who was living with him, obtained a series of checks from his home and forged his signature on several checks which the bank deposited and debited against the plaintiff account in June 2007.[64]  Simms also allegedly intercepted the bank statements to prevent the plaintiff from detecting the fraud.[65]  Approximately 105 checks were forged causing the plaintiff to suffer a loss of $11,800.00.[66]  The plaintiff only learned of the forgeries when he received his August 2007 bank statement on September 5, 2007.[67]  The trial court entered judgment dismissing the plaintiff's claims against the bank, and the plaintiff appealed, arguing that the bank failed to exercise ordinary care in paying the checks.[68]

As in the present case, Groue and Capital One were subject to a Deposit Agreement that required a customer to promptly check the bank statements and report any fraudulent activity within ten calendar days.[69]  Notwithstanding the fact that the bank statements were allegedly stolen, the appellate court found that the plaintiff failed to comply with his duties under the Deposit Agreement and the law.  The court held:  "Early detection of Simms' forgeries could have prevented the subsequent losses, and plaintiff's failure to review the June 2007 statement precludes him from asserting all subsequent forgeries by that same unauthorized signatory."[70]

The *Groue* court also rejected the plaintiff's contention that the bank could not shorten a legal notice or prescriptive period:

---

[63] 2010-0476 (La.App. 1 Cir. 9/10/10), 47 So.3d 1038.
[64] *Id.* at 1039-40.
[65] *Id.* at 1040.
[66] *Id.* at 1039-40.
[67] *Id.* at 1040.
[68] *Id.*
[69] *Id.* at 1042.
[70] *Id.* (citing *Marx*, 713 So.2d at 1147).
Document Number: 47540

[B]anks and customers may modify their duties by contract as described in LSA–R.S. 10:4–103. *See Peak v. Tuscaloosa Commerce Bank*, 96–1258, p. 8 (La.App. 1 Cir. 12/29/97), 707 So.2d 59, 64. Louisiana Revised Statutes 10:4–103(a) states, in pertinent part:

> The effect of the provisions of this Chapter may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

As such, a bank and its customer may contract for any object which is lawful, possible, determined or determinable, and once the contract has been established, it is the law between the parties. *Peak*, 96–1258 at p. 8707, 707 So.2d at 64 (citing LSA–C.C. arts. 1971 and 1983).[71]

Notably, the *Groue* court also held that La. R.S. § 10:3–103(a)(7), which defines "ordinary care," "does not impose a duty upon a paying bank to inspect every check to verify signatures appearing thereon prior to processing the check for payment. The mere fact that a bank may have paid an item over a forged signature does not establish that a bank failed to exercise 'ordinary care.'"[72]

Accordingly, Plaintiff has failed to demonstrate a deviation from the Bank's own policies and procedures, the language of the Deposit Agreement and Signature Card, or local banking standards and practices. Plaintiff's claims are time barred under the law and the contract between the Parties.

### 5. Plaintiff Failed to Exercise Ordinary Care

The Court finds that the record is replete with evidence demonstrating that Plaintiff failed to exercise ordinary care, and Plaintiff's own negligence caused the losses Plaintiff

---

[71] *Id.* at 1041.
[72] *Id.* at 1044.

has suffered.  Plaintiff does not dispute that its bookkeeper immediately preceding Alford defrauded the firm in similar fashion by forging checks.  Despite this history, Plaintiff allowed Alford significant access to its finances and continued to allow Alford to open the firm's bank statements.[73]  Additionally, despite Alford's altering the signatures on numerous bank statements, several ACH transactions explicitly list Alford's name and should have alerted Plaintiff that a more substantive review of the statements were necessary.[74]

Grodner also admitted that she allowed Alford to use her signature stamp on a few occasions and, although it was only to be used with Grodner's permission, the stamp was kept in a "double lockbox" to which Alford was given the keys.[75]  By Grodner's own admission, Plaintiff assumed the risk set forth in Section 5 of the Deposit Agreement:  "If you use a facsimile signature or other form of signature for signing or authenticating items drown on your account, **you assume the entire risk that such facsimile signature or device will be used improperly or by an unauthorized person**. We will have no liability to you for paying items signed or authenticated by any person who is not authorized to affix such facsimile signature or use such device or by any person who exceeds his or her authority to do so."[76]

Plaintiff appears to place a greater burden on the Bank to supervise the conduct of its employee than Plaintiff itself was willing to undertake.  Plaintiff alleges that the Bank should have "paused" and "realized" that Alford was an ACH employee paid every two

---

[73] Rec. Doc. No. 15-3 at 12-14 (Deposition of Donna Grodner, pp. 11-13).
[74] *See* Rec. Doc. No. 19-1 at 6, Regions Bank Statement on Account ending in 1715, dated January 30, 2016 through February 29, 2016, ACH transaction of 2/23 payable to Anna Alford.
[75] *Id.* at 73 (Deposition of Donna Grodner, p. 72).
[76] Rec. Doc. No. 15-9 at 8 (emphasis added).
Document Number: 47540

weeks like Plaintiff's other employees.[77]  Plaintiff further alleges that the Bank should have "paused" and realized that Alford "did not make that kind of money," and should not have believed a bookkeeper made "commission."[78]  According to Plaintiff, the Bank should have "paused and used a little common sense" because it should have known "that bookkeepers do not make that kind of money."[79]  To the contrary, the record in this case demonstrates that Plaintiff should have paused and investigated Alford's background before hiring her; monitored the financial affairs of the firm more closely considering the embezzlement by the previous bookkeeper; protected Grodner's signature stamp from unauthorized access; and realized something was amiss before losing over $150,000.00 at the hands of its employee. Indeed, it is simply not the Bank's duty or responsibility, under the law or the Deposit Agreements, to make the inquiries Plaintiff suggests or to rectify Plaintiff's failure to supervise its employees and failure to implement rudimentary internal controls.

In a similar case, the District Court for the Eastern District of Louisiana noted that "[o]ne persistent undercurrent of the banking laws that apply to this action are that bank customers have a duty to monitor their own affairs."[80]  The obligation was on Plaintiff to monitor the financial affairs of the firm, safeguard its assets and access to funds, and supervise the conduct of its employees.  It is simply an untenable argument that the Bank had this obligation rather than the Plaintiff.

---

[77] Rec. Doc. No. 1-2, ¶ 22.
[78] *Id.* at ¶ 23.
[79] *Id.* at ¶ 24.
[80] *Grubaugh v. Central Progressive Bank*, No. 13-3045, 2014 WL 794141 at *4 (E.D. La. Feb. 27, 2014).
Document Number: 47540

**C.**     **Plaintiff's Claims are Untimely Without Consideration of Fault**[81]

Notwithstanding the Court's reasoning and analysis set forth above in consideration of the fault of the Parties, Plaintiff's claims are time barred as a matter of law even without regard to fault.  La. R.S. § 10:4–406(f) provides:

> **Without regard to care or lack of care of either the customer or the bank**, a customer who does not within one year after the statement or items are made available to the customer (Subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. (emphasis added).

Notably, good faith considerations are wholly irrelevant under La. R.S. § 10:4–406(f).   Plaintiff had one year to report any unauthorized signatures or alterations but failed to do so.  Plaintiff's meritless claims regarding the alleged illegality of shortening a legal prescriptive period were considered and rejected by the court in *Groue*, in keeping with a wealth of jurisprudence on the issue.

The court in *Grubaugh v. Central Progressive Bank* addressed a bank customer's claim of conversion pursuant to La. R.S. § 10:3–420, which carries a prescriptive period of one year, against the bank after the customer's mother and sister obtained checks and forged fraudulent checks on his account.[82]  Because the plaintiff failed to establish fraud on the part of the bank, the court held that the theory of *contra non valentum* did not toll the prescriptive period, and the plaintiff's conversion claims had prescribed.  The court stated:

---

[81] Plaintiff has not argued that *contra non valentum* should apply in this case to interrupt prescription; however, the Court finds that the doctrine of *contra non valentum* is nonetheless unavailable to Plaintiff because it would require a showing of fraudulent concealment on the part of the Bank, which has not been demonstrated here.  *See Peak Performance Physical Therapy & Fitness, LLC v. Hibernia Corp.*, 2007-2206 (La.App. 1 Cir. 6/6/08), 992 So.2d 527, 533.

[82] 2014 WL 794141 at *1.

Document Number: 47540

This conclusion best reflects the UCC's "goals of certainty of liability, finality, predictability, uniformity, and efficiency in commercial transaction," as well as the tenet that the "**victim of conversion is often in the best position to prevent or detect the loss, and thus should be responsible to monitoring their accounts and employees to detect if they have been the victim of conversion of funds**."[83]

Accordingly, Plaintiff is precluded from making claims for Alford's unauthorized signatures and/or alterations as a matter of law.[84]

### D.    The Bank is not a Fiduciary

Plaintiff's *Petition* does not appear to allege that the Bank was a fiduciary. However, Plaintiff's arguments in briefing suggest that Plaintiff believes the Bank owed Plaintiff numerous duties outside those clearly set forth in the Deposit Agreement. To the extent that Plaintiff has asserted this claim, it is clearly foreclosed by Louisiana law. La. R.S. § 6:1124 states, in pertinent part:

> No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary. The fiduciary responsibility and liability of a financial institution or any officer or employee thereof shall be limited solely to performance under such a contract and shall not extend beyond the scope thereof. [ ... ] This Section is not limited to credit agreements and shall apply to all types of relationships to which a financial institution may be a party.

Plaintiff has provided no evidence that the Bank assumed any fiduciary duties or obligations outside of the Deposit Agreements governing the relationship of the Parties.

---

[83] *Id.* at \*5 (quoting *Specialized Loan Servicing, LLC v. January*, 2012-2668 (La. 6/28/13), 119 So.3d 582, 589–590)(emphasis added).

[84] The Court notes that Plaintiff repeatedly refers to breach of contract and argues its claims are subject to a 10 year prescriptive period. However, Plaintiff has not asserted a breach of contract claim against the Bank, and the *Petition* states only one cause of action for "GROSS NEGLIGENCE/CONVERSION." Rec. Doc. No. 1-2, ¶ 29.

Document Number: 47540

Plaintiff has failed to present any legal authority for, or evidence of, any written policy that required the Bank to call Plaintiff for approval before cashing checks, required the Bank to check and compare signatures, or required the Bank to know the salary and payment procedures for Plaintiff's employees. The Court finds, as a matter of law, that Plaintiff has no claim against the Bank for breach of fiduciary duty because it has failed to offer summary judgment evidence to support the conclusion that a fiduciary relationship existed.

## III.    CONCLUSION

For the foregoing reasons, the *Motion for Summary Judgment*[85] filed by Regions Bank is GRANTED. Plaintiff's claims are dismissed with prejudice.

The Oral Argument set for Monday, September 10, 2018 is hereby CANCELED. All pending motions are denied as moot, and the Clerk of Court is directed to terminate these motions.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 5th day of September, 2018.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[85] Rec. Doc. No. 15.
Document Number: 47540